## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **J.C.,**<br><br>        Plaintiff,<br><br>v.<br><br>**BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA; GEORGIA COLLEGE AND STATE UNIVERSITY; STEVE M. DORMAN, individually, and in his official capacity as PRESIDENT of GEORGIA COLLEGE AND STATE UNIVERSITY; and SHAWN BROOKS, individually, and in his official capacity as VICE-PRESIDENT FOR STUDENT AFFAIRS of GEORGIA COLLEGE AND STATE UNIVERSITY.**<br><br>        Defendants. | CASE NUMBER:_____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND DAMAGES

COMES NOW, J.C., Plaintiff in the above-styled action, by and through the undersigned counsel, and files this, her Complaint for Civil Rights Violations and Damages, showing this Court as follows:

### I.    INTRODUCTION

1.    This is an action for Damages and Civil Rights Violations sustained by J.C., a female citizen of the United States against the Board of Regents of the

1

University System of Georgia ("BOR"); Georgia College and State University ("GCSU"); Steve M. Dorman, individually, and in his Official Capacity as President of Georgia College and State University; and Shawn Brooks, individually, and in his Official Capacity as Vice-President for Student Affairs of Georgia College and State University.

2.      The Institutional and Individual Defendants, the Board of Regents of the University System of Georgia; Georgia College and State University; Steve M. Dorman, individually, and in his Official Capacity as President of Georgia College and State University; and Shawn Brooks, individually, and in his Official Capacity as Vice-President for Student Affairs of Georgia College and State University are directly responsible for the illegal and unlawful conduct of a student enrolled at Georgia College and State University which deprived J.C. of exercising the benefits provided by GCSU; and for the failure of the Institutional Defendants, the Board of Regents of the University System of Georgia; Georgia College and State University; Steve M. Dorman, individually, and in his Official Capacity as President of Georgia College and State University; and Shawn Brooks, individually, and in his Official Capacity as Vice-President for Student Affairs of Georgia College and State University, to protect J.C. from Persons like Christopher Fisher, a student at Georgia College and State University.

## II.    JURISDICTION AND VENUE

**3.**    This action is brought pursuant to Title IX (20 U.S.C. § 1681 *et seq.*), and 42 U.S.C. § 1983.

**4.**    The jurisdiction of this Court is predicated on 28 U.S.C. § 1343, 28 U.S.C. § 1331, and 42 U.S.C. § 1983.

**5.**    Because the Defendant Board of Regents of the University System of Georgia resides within the Northern District of Georgia, Atlanta Division, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b).

## III.    PARTIES

**6.**    Plaintiff, J.C., is a resident of Georgia, and at all times relevant to the allegations of this Complaint was a resident of Georgia and a citizen of the United States of America.

**7.**    At all times relevant to this action, the Defendant Board of Regents of the University System of Georgia, was responsible for managing, overseeing, employing and supervising persons associated with and employed with Georgia College and State University, located in Milledgeville, Baldwin County, Georgia, and Defendant Board of Regents of the University System of Georgia is by virtue of the laws of the State of Georgia, subject to venue and jurisdiction of this Court, and the Defendant Board of Regents of the University System of Georgia can be served by process, by serving the Honorable Chris Carr, Attorney General for the

State of Georgia, at 40 Capitol Square, SW, Atlanta, Georgia 30334 and by serving Steve Wrigley, Chancellor of the Board of Regents of the University System of Georgia at 270 Washington Street, SW, Atlanta, Georgia 30334.

8.     Steve M. Dorman is subject to the venue and jurisdiction of this Court. Steve M. Dorman is sued individually and in his official capacity as President of Georgia College and State University. He may be personally served at the Office of the President, 300 Parks Hall, 231 W. Hancock Street, Milledgeville, Georgia 31061.

9.     Shawn Brooks is subject to the venue and jurisdiction of this Court. Shawn Brooks is sued individually and in his official capacity as Vice-President for Student Affair of Georgia College and State University. He may be personally served at the Office of the Student Affairs, 206 Parks Hall, 231 W. Hancock Street, Milledgeville, Georgia 31061.

## IV.     FACUTAL ALLEGATIONS

10.     Plaintiff, J.C., resides in the State of Georgia and is a former student of Georgia College and State University (hereinafter "GCSU"). As such, she was a member of a protected class and a student in an educational program receiving federal financial assistance pursuant to 20 U.S.C. § 1681, *et seq*. ("Title IX").

**11.** Between March 16, 2018, and March 22, 2018, Plaintiff and few of her GCSU classmates were on spring break at an off-campus location in Lake Hartwell, Georgia.

**12.** While on this trip Plaintiff was drugged and subsequently raped by fellow GCSU student Christopher Fisher (hereinafter "Fisher").

**13.** At the time of the rape, it is believed that Fisher was a sophomore at GCSU and a member of the Club Rugby team.

**14.** At the time of the rape, J.C. was a freshman and a member of the cheerleading squad.

**15.** Plaintiff attempted to report the assault and rape to GCSU officials under Title IX and GCSU policies.

**16.** In late February or early March 2019, Plaintiff first attempted to report the assault and rape by fellow student Fisher at the Women's Center located on GCSU's campus at Blackbridge Hall, 111 S. Clarke Street, Milledgeville, Georgia 31061.

**17.** Plaintiff attempted to request relief in the form of a no-contact policy pursuant to GCSU's policies.

**18.** The Title IX representative told Plaintiff that "no one had ever been found responsible of a Title IX case here at GCSU" and that the Title IX

representative "was not even sure" that the no-contact policy that Plaintiff was requesting "was even a thing[.]"

19.     The statement made by the GCSU Title IX representative defies common sense and is contrary to the University System of Georgia (hereinafter "USG") Policy Manual.

20.     Specifically, Section 6.7.2(A) of the USG Policy Manual states that when a complainant makes a report of sexual misconduct, the responsible employee is to notify and report all relevant information to the school's Title IX coordinator as soon as practicable.

21.     The Title IX coordinator is to then refer the complaint to the system director of "any allegation(s) of sexual misconduct that could, standing alone as reported, lead to the suspension or expulsion of the respondent(s)."

22.     The system director is then to decide whether any interim measures, including a no-contact policy under Section 4.5.6.2 of the USG Policy Manual are necessary and will assign an investigator to discover the underlying facts and circumstances surrounding the complaint.

23.     By failing to keep an adequate record of Plaintiff's initial report and by wrongfully informing her that the interim measures she was requesting was not "even a thing[,]" and by completely disregarding her pain and experience, GCSU failed to act in accordance with USG policy.

24.    Plaintiff was finally able to file her no-contact policy with GCSU in March of 2019.

25.    Between December of 2018 and May of 2019, Fisher began to harass and stalk Plaintiff on the GCSU campus.

26.    Fisher joined the cheerleading squad that Plaintiff was a member of and changed his schedule to join Plaintiff's scuba class and her student teaching class that she was enrolled in.

27.    Plaintiff reported Fisher's conduct to her professor, Scott Stefano, and his teacher's aide, Hunter Lane.

28.    When Plaintiff reported these things to GCSU, she was told by Emily Brookshire, a GCSU staff member, that Fisher could stay on the cheerleading team but was to stay five feet away from Plaintiff at games.

29.    Instead of offering any practical, effective interim measures to curb Fisher's conduct, Emily Brookshire suggested that Plaintiff go to counseling as it would be "best for everyone involved."

30.    Fisher continued to stalk and harass Plaintiff by waiting for her outside of the building where her biology class was located; following her around campus; repeating her name and calling after her; and making sure that she received an anonymous tip that Fisher and his roommates all possessed 9mm handguns which they would use if she spoke to anyone about the rape. Fisher's

actions caused Plaintiff to file a police report with the Baldwin County Sheriff's Office on April 29, 2019.

31.    After Plaintiff filed a police report regarding Fisher's conduct, GCSU finally began to take Plaintiff's Title IX report seriously.

32.    GCSU began their investigation of Plaintiff's Title IX report in May 2019, nearly a year after the assault took place and two months after Plaintiff initially requested the no-contact policy.

33.    Six months later, GCSU held a hearing on the Title IX claim on November 11, 2019, and both Plaintiff and Fisher were able to be heard.

34.    Between May 2019 and November 2019, while it was investigating Fisher's rape of Plaintiff, GCSU failed to implement any protective measures to prevent Fisher from harassing and stalking Plaintiff, despite GCSU's knowledge of the same.

35.    The Hearing Panel found that Fisher violated GCSU's Code of Conduct that forbids Sexual Misconduct: Non-Consensual Sexual Contact.

36.    In its findings, the Hearing Panel stated: "Based on careful consideration of the written documents and the testimony presented, the Hearing Panel found Christopher Fisher responsible for violating Georgia College's Sexual Misconduct Policy: Non-Consensual Sexual Contact and not responsible for Intentional Harassment. It is the opinion of the panel non-consensual sexual

8

contact did occur. Both the complainant and the respondent agreed that the complainant consumed a minimum of 2 alcoholic drinks and 2 shots of alcohol; therefore, more likely than not, the complainant was unable to give consent. Therefore, because of the finding of responsible, the sanctions are: disciplinary suspension for two years or until December 31, 2021; and before returning to the Georgia College community as an enrolled student, [Fisher] must show proof of participating in both an alcohol and drug education program  as well as an educational program on preventing sexual misconduct that specifically addresses consent."

37.    Fisher appealed this decision to Shawn Brooks (hereinafter "Brooks"), Vice-President of Student Affairs for GCSU.

38.    Brooks remanded the Title IX hearing decision back down to the investigatory/hearing panel to answer two questions: (1) Did the evidence from the investigation or hearing demonstrate that the Complainant did not have the capacity to give consent? and (2) If the Complainant did not have the capacity to give consent, did the Respondent know or should have known that the Complainant did not have the capacity to give consent?

39.    The GCSU investigatory/hearing panel answered those questions as follows:

> "It is the opinion of the hearing panel that non-consensual sexual contact did occur. The Respondent knew or should have known

9

that the Complainant did not have the capacity to give consent. On the night in question, the Complainant called out two different men's names during intercourse. A reasonable person would have stopped having intercourse at this point; however, the Respondent stated that he did not stop having intercourse until she started throwing up. Because the Complainant was drinking alcohol, calling out other men's names during intercourse, and threw up during intercourse, the Panel believes this is substantial evidence that the Complainant was incapacitated and did not have the ability to give consent."

40.   The "Findings from the Remand by the Vice President of Student Life" (hereinafter "findings letter") provided that either party may appeal the decision, in writing, within five business days of the findings letter to the President of GCSU, Steve M. Dorman (hereinafter "Dorman").

41.   Almost six weeks after the findings letter, Brooks, in violation of GCSU's own policy and the express statement listed in the findings letter, *sua sponte* reversed the hearing panel's decision, stating: "After a thorough review of the case, which includes information from the remanded limited scope inquiry, it is my decision that a 'factual defect' has occurred within the case. Specifically, I do not believe that a preponderance of the evidence has sufficiently served to find Mr. Fisher responsible for the charges brought against him. Accordingly, it is my decision to dismiss the case."

42.   Brooks circumvented the initial findings of the investigatory/hearing panel as well as the updated, affirmative findings based on the remand that Brooks himself initiated.

10

**43.**    Brooks alleged that a "factual defect" occurred but provided no indication of what factual defect was substantial enough to reverse the decision.

**44.**    Brooks' *sua sponte* action to reverse the investigatory/hearing panel's decision did not follow the procedures listed in GCSU's Policy Manual or in GCSU's own correspondence to Plaintiff and constituted intentional, cruel, and malicious conduct.

**45.**    Section 4.6.5.3 of the GCSU Policy Manual provides that the alleged offender shall have the right to appeal the outcome on the following grounds: (1) to consider new information, sufficient to alter the decision, or other relevant facts not brought out in the original hearing, because such information was not known or knowable to the person appealing during the time of the hearing; (2) to allege a procedural error with in the hearing process that may have substantially impacted the fairness of the hearing, including but not limited to whether any hearing questions were improperly excluded or whether the decision was tainted by bias; or (3) to allege that the finding was inconsistent with the weight of the information.

**46.**    Section 4.6.5.3 of the GCSU Policy Manual also provides that "The Vice President, or his or her designee, may affirm the original finding and sanction, affirm the original finding but issue a new sanction of lesser severity, remand the case back to the decision-maker to correct a procedural or factual

11

defect, or reverse or dismiss the case if there was a procedural or factual defect that cannot be remedied by remand." Accordingly, "The Vice President or his or her designee shall then issue a decision in writing to the respondent within a reasonable time period."

47.    Here, Fisher appealed the decision of the hearing panel to Brooks. Brooks then remanded the action back to the hearing panel, his designee, to answer the two questions stated above and Tom Morris, Dean of Students, acting as Brooks' designee, again affirmed the findings of the investigatory/hearing panel.

48.    There is no provision in the GCSU Policy Manual or BOR Manual that allows for any *sua sponte* action by the Vice President when his office, by his designee, has already issued a decision.

49.    Under GCSU's policy, Brooks did not have the ability to *sua sponte* reverse the affirmation of the hearing panel's decision. Any subsequent appeal would have to be heard by GCSU's President Dorman.

50.    The findings letter states that both parties can appeal, in writing, within five business days of the letter, and "The appeal should be addressed to the President of Georgia College, Dr. Steve Dorman."

51.    Accordingly, based upon the findings letter, the decision was no longer Brooks' to make.

52.    Brooks' decision has caused a complete upheaval of Plaintiff's life and education.

53.    Plaintiff's mother, R.C., attempted to appeal Brooks' decision to Dorman under Section 4.6.5.3 of GCSU's Policy Manual.

54.    Dorman responded to Plaintiff's mother, R.C., as follows: "Please know that I do not review the facts pertaining to any case until it is properly brought before me. Under our Sexual Misconduct Policy, the decision of the Vice President may be appealed to me by the student within five business days."

55.    To allege that Brooks can reverse his designee's decision weeks later and then subsequently deny any appeal of that decision is without logic and does not meet the guidelines established in Section 4.6.5.3 of GCSU's Policy Manual.

56.    Plaintiff also attempted to appeal Dorman's decision to the Board of Regents of the University System of Georgia (hereinafter "Board") in accordance with the Board's Policy on Discretionary Review; however, the Board ratified GCSU's continual violations of its Policy Manual.

57.    As a result of GCSU's failure to follow and implement its Title IX policies, Plaintiff has experienced severe depression and anxiety.

58.    Plaintiff was forced to withdraw from GCSU and move out of her apartment located in Milledgeville in August of 2019.

**59.** Plaintiff paid for said apartment through December of 2019, which caused her to lose those monies already paid.

**60.** Brooks' unilateral reversal of the findings of the investigation/hearing panel has left Plaintiff paralyzed by having to put her education and her life on hold and move home because GCSU was no longer a safe environment for her.

**61.** Plaintiff now receives counseling and other related services as a result of GCSU's failure to follow and implement its obligations under Title IX.

**62.** Plaintiff has put GCSU and the Board on notice of these effects in both the evidence presented to the investigation/hearing panel and her request for Discretionary Review to the Board.

**63.** Plaintiff, through undersigned counsel, has complied with Gebser v. Lago Vista Independent School District, by sending the Gebser notice to all Defendants.

## V.    CLAIMS FOR RELIEF

### A.    Claims Arising Under Title IX

**64.** 20 U.S.C. § 1681 *et seq.* prohibits discrimination on the basis of sex under any education program or activity receiving federal financial assistance.

65.    In an effort to further the goal of prohibiting discrimination on the basis of sex, and to ensure compliance with the same, the Board of Regents maintains its Policy Manual.

66.    Specifically, Section 6.7 of the Policy Manual contains the Board of Regents' "Sexual Misconduct Policy" which provides that "[w]hen sexual misconduct does occur, all members of the [University System of Georgia] community are strongly encouraged to report it promptly through the procedures outlined in this Policy. The purpose of this Policy is to ensure uniformity throughout the USG reporting and addressing sexual misconduct."

67.    The Policy Manual defines sexual misconduct as including, but not limited to "such unwanted behavior as dating violence, domestic violence, nonconsensual sexual contact, nonconsensual sexual penetration, sexual exploitation, sexual harassment and stalking."

68.    Similarly, Section 4.6.5 of the Policy Manual contains the Board of Regents' "Standards for Institutional Student Conduct Investigation and Disciplinary Proceedings" which provides that "[t]he purpose of this Policy is to ensure uniformity in the quality of investigations while providing for due process that affords fairness and equity in all student conduct investigations."

69.    With respect to interim measures, Section 6.7.3(B) of the Policy Manual provides that: "Interim measures may be implemented at any point after

the institution becomes aware of an allegation of Sexual Misconduct and should be designed to protect any student or other individual in the USG community. Such measures are designed to restore or preserve equal access to the education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties or the campus community, or deter Sexual Misconduct and retaliation. Interim measures must be provided consistent with the provisions in applicable Board and institutional policies and procedures."

70.    In the instant case, a number of these Policy provisions were not followed.

71.    When J.C. first attempted to report being raped by another student to GCSU and requested a no contact policy, she was informed that "no one had ever been found responsible for a Title IX case here at GCSU" and that the Title IX representative "was not even sure" that the no-contact policy J.C. was requesting "was even a thing[.]"

72.    The response by GCSU and its representative violated Title IX and Section 6.7.2(A) of the Policy Manual, which mandates that when a complainant makes a report of sexual misconduct, the responsible employee is to notify and report all relevant information to the school's coordinator as soon as practicable. The coordinator is then to refer the complaint to the system director, who decides

whether any interim measures, including a no-contact policy under Section 4.5.6.2, are necessary.

73.    GCSU has a policy and practice of minimalizing and dismissing complaints of sexual misconduct.

74.    GCSU's policy and practice of minimalizing and dismissing complaints of sexual harassment is severe and pervasive.

75.    Following Plaintiff's initial report, GCSU failed to keep an adequate record of said initial report. GCSU wrongfully informed Plaintiff that the interim measures she was requesting were not "even a thing" and failed to act in accordance with USG policy.

76.    After Plaintiff made a report to the Baldwin County Sheriff's Office, GCSU finally took steps under Title IX and its policy to investigate, but failed to conduct a timely investigation, taking six months to hold a hearing.

77.    The hearing panel determined that Mr. Fisher violated one section of GCSU's Code of Conduct, Sexual Misconduct: Non-Consensual Sexual Contact.

78.    Mr. Fisher appealed this decision to Vice-President Brooks, who remanded the action back down to the investigatory panel to answer two questions: (1) Did the evidence from the investigation or hearing demonstrate that the Complainant did not have the capacity to give consent? and (2) If the Complainant did not have the capacity to give consent, did the Respondent know

17

or should have known that the Complainant did not have the capacity to give consent?

79.    The hearing panel found that Mr. Fisher knew or should have known that J.C. did not have the capacity to consent due to her calling out two different men's names for help during intercourse and due to her vomiting during the intercourse.

80.    The hearing panel then issued a "Findings from the Remand by the Vice President of Student Life" which provided that either party may appeal the decision, in writing, within five business days, to the President of Georgia College, Dr. Steve Dorman.

81.    Instead, almost six weeks after that letter, Dr. Brooks, in violation of GCSU's own policy and the express statement in the "Findings from the Remand by the Vice President of Student Life" sent to both parties, *sua sponte* reversed the hearing panel's decision.

82.    Dr. Brooks simply wrote in an email to both parties: "After a thorough review of the case, which includes information from the remanded limited scope inquiry, it is my decision that a 'factual defect' has occurred within the case. Specifically, I do not believe that a preponderance of the evidence has sufficiently served to find Mr. Fisher responsible for the charges brought against him. Accordingly, it is my decision to dismiss the case."

18

83.    Section 4.6.5.3 of the Policy Manual provides that the alleged offender shall have the right to appeal the outcome on the following grounds: (1) to consider new information, sufficient to alter the decision, or other relevant facts not brought out in the original hearing, because such information was not known or knowable to the person appealing during the time of the hearing; (2) to allege a procedural error within the hearing process that may have substantially impacted the fairness of the hearing, including but not limited to whether any hearing questions were improperly excluded or whether the decision was tainted by bias; or (3) to allege that the finding was inconsistent with the weight of the information.

84.    Section 4.6.5.3 also provides that "The Vice President or his or her designee, may affirm the original finding and sanction, affirm the original finding but issue a new sanction of lesser severity, remand the case back to the decision-maker to correct a procedural or factual defect, or reverse or dismiss the case if there was a procedural or factual defect that cannot be remedied by remand" and "The Vice President or his or her designee shall then issue a decision in writing to the respondent within a reasonable time period."

85.    Mr. Fisher appealed the decision of the hearing panel to Dr. Brooks.

86.    Dr. Brooks then remanded the action back to the hearing panel, his designee, to answer the two questions discussed above.

87.    Tom Morris, Dean of Students, acting as Dr. Brooks' designee through the hearing panel, affirmed its original findings.

88.    Section 4.6.5.3 does not state that the Vice President or his or her designee get a second chance at reversing a decision after remand, it simply states that the Vice President can remand the case back to the decision-maker to correct a procedural or factual defect.

89.    Section 4.6.5.3 does state that the case can only be reversed or dismissed if there was a procedural or factual defect that **cannot be remedied by remand**.

90.    Therefore, Dr. Brooks' untimely decision to reverse the decision of the hearing panel, after the remand he initiated, was not only unfounded, but it also is in direct violation of 4.6.5.3 of the Policy Manual.

91.    Brooks' actions constitute discrimination against Plaintiff, and such discrimination was severe given the violation of GCSU's own policy.

92.    Under Section 4.6.5.3 of the Policy Manual, J.C.'s mother, R.C., attempted to appeal Dr. Brook's belated decision to Dr. Dorman.

93.    Dr. Dorman replied: "Please know that I do not review the facts pertaining to any case until it is properly brought before me. Under our Sexual Misconduct Policy, the decision of the Vice President may be appealed to me by the student within five business days."

20

94.    GCSU and its officials cannot have it both ways—either Dr. Brooks'
designee, Tom Miles, affirmed the decision of the hearing panel after the remand
and that decision should stand, or Dr. Brooks' *sua sponte* reversal decision is
operative, which would allow J.C. to appeal to Dr. Dorman.

95.    J.C. attempted to appeal Dr. Dorman's decision to the Board of
Regents in accordance with the Board of Regents' Policy on Discretionary
Review; however, the Board of Regents ratified GCSU's continual violation of
its Policy Manual and discrimination of Plaintiff.

96.    Accordingly, based on the foregoing, GCSU, Dr. Shawn Brooks, Dr.
Steve Dorman, and the Board of Regents of the University System of Georgia had
knowledge of the discrimination and harassment that J.C. endured and even
participated in said discrimination.

97.    GCSU, Dr. Shawn Brooks, Dr. Steve Dorman, and the Board of
Regents of the University System of Georgia acted with deliberate indifference
to the known discrimination and harassment experienced by J.C. by failing to
implement and follow the Policy Manual.

98.    This discrimination by GCSU was severe and pervasive.

99.    As a result of GCSU, Dr. Shawn Brooks, Dr. Steve Dorman, and the
Board of Regents of the University System of Georgia's deliberate indifference,
J.C. has been effectively barred from educational opportunities or benefits.

**100.**    J.C. no longer feels safe at GCSU and, as such, she was forced to put her education on hold.

**101.**    J.C. was forced to move out of her apartment in Milledgeville in August of 2019 even though her rent had been paid through December of 2019.

**102.**    J.C. now has to receive counseling and other related services as a result of being raped and subsequently discriminated against by GCSU and its officials.

**103.**    Accordingly, J.C. is entitled to damages in an amount to be proven at trial.

B.    Claims Arising Under Section 1983

**104.**    The acts hereinbefore alleged constitute a violation of 42 U.S.C. § 1983.

**105.**    Dr. Shawn Brooks and Dr. Steve Dorman are liable individually, under 42 U.S.C. § 1983, for their failure to implement policies and procedures to ensure compliance with Title IX.

**106.**    Dr. Shawn Brooks failed to implement Section 4.6.5.3 of the Board of Regents' Policy Manual by unilaterally reversing the decision of the Hearing Panel after remand.

107.    Dr. Steve Dorman failed to implement Section 4.6.5.3 of the Board of Regents' Policy Manual by failing to consider J.C.'s appeal of Dr. Brooks' *sua sponte* reversal.

108.    Both Dr. Shawn Brooks and Dr. Steve Dorman acted with deliberate indifference towards J.C. by not only reversing the decision of the Hearing Panel, but also by foreclosing any opportunity for J.C. to appeal Dr. Brooks' decision.

109.    Accordingly, due to this failure to implement policies and deliberate indifference to the same, Dr. Brooks and Dr. Dorman are individually liable to J.C. in an amount to be proven at trial.

   C. Intentional Infliction of Emotion Distress Under Georgia Law

110.    By failing to abide by Title IX and GCSU policy with respect to the fair administration of Plaintiff's complaint of sexual assault, Defendants engaged in conduct that was intentional, reckless, extreme, and outrageous.

111.    This conduct caused Plaintiff damages in the form of emotional distress, pain and suffering, and reasonable expenses that were lost due to Plaintiff being forced to withdraw from GCSU. Plaintiff also lost the educational benefits afforded to her because of Defendants' conduct.

112.    With respect to claims against the Institutional Defendants, Georgia's Constitution provides absolute sovereign immunity for all tort

claims, including intentional tort claims; however, the Georgia Tort Claims Act provides a limited waiver of the state's sovereign immunity for the torts of its officers and employees.

113.    With respect to claims against the Individual Defendants, Georgia's Constitution permits lawsuits against employees of the state for actions undertaken with actual malice or with actual intent to cause injury in the performance of said employee's official functions or for the negligent performance of, or negligent failure to perform, said employee's ministerial functions.

114.    Here, Steve Dorman and Shawn Brooks negligently failed to perform their ministerial functions as President and Vice-President for Student Affairs of GCSU.

115.    Steve Dorman failed to allow any appeal of Shawn Brooks' *sua sponte* reversal of the Hearing Panel's decision finding Fisher responsible of sexual misconduct.

116.    Shawn Brooks failed to follow USG and GCSU policy and procedure by deciding to *sua sponte* reverse a decision of the Hearing Panel that, under said policies and procedures, were no longer his to make.

117.    Shawn Brooks acted with malice and intent to cause injury by interfering and making a *sua sponte* decision.

**118.**    This negligent performance of ministerial functions have caused damage to Plaintiff in an amount to be proven at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE the School District respectfully requests the following relief

    a) Compensatory damages in an amount to be proven at trial;

    b) Punitive damages in an amount to be proven at trial;

    c) Costs of this action, including attorney's fees;

    d) Plaintiff demands a trial by jury; and

    e) Such other and further relief as the Court deems appropriate.

Respectfully submitted this _30th_ day of _October_____, 2020.

SMITH, WELCH, WEBB & WHITE, LLC

Megan Murren Rittle
Georgia Bar No. 384595

M. Chase Collum
Georgia Bar No. 991516

SMITH, WELCH, WEBB & WHITE, LLC
P.O. Box 10
2200 Keys Ferry Court
McDonough, Georgia 30253
TELEPHONE: (770) 957-3937
FACSIMILE: (678) 584-4888
mmrittle@smithwelchlaw.com
ccollum@smithwelchlaw.com