UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

J.C.,

       Plaintiff,

    v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA, et al.,

       Defendants.

CIVIL ACTION NO.
1:20-CV-4445-JPB

## ORDER

This matter comes before the Court on the Motion for Summary Judgment

[Doc. 34] and Amended Motion for Summary Judgment [Doc. 35] filed by the

Board of Regents of the University System of Georgia ("USG"); Georgia College

and State University ("GCSU"); Steve M. Dorman, individually and in his official

capacity as President of GCSU; and Shawn Brooks, individually and in his official

capacity as Vice President for Student Affairs of GCSU (collectively,

"Defendants").  This Court finds as follows:

## FACTUAL HISTORY

J.C. ("Plaintiff"), a former GCSU student, was sexually assaulted and

subsequently harassed by another student.  This case concerns Defendants'

response to these events.

The Court derives the facts of this case from Defendants' Statement of Undisputed Material Facts, [Doc. 34-1]; Plaintiff's Statement of Disputed Material Facts in Opposition to Defendants' Motion for Summary Judgment, [Doc. 48]; Plaintiff's Statement of Additional Material Facts to Which There Exists a Genuine Issue to Be Tried, [Doc. 49]; and Defendants' Response to Plaintiff's Statement of Additional Material Facts, [Doc. 53]. The Court also conducted its own review of the record.

The Local Rules of this Court require a respondent to a summary judgment motion to include with its responsive brief "[a] response to the movant's statement of undisputed facts." N.D. Ga. Civ. R. 56.1(B)(2)(a). The Local Rules make clear that the Court will deem each of the movant's facts admitted unless the respondent refutes or objects to the fact or shows that the fact is either immaterial or unsupported by the record. Further, in accordance with the Local Rules, this Court will not consider unsupported facts. The Court will, however, use its discretion to consider all facts the Court deems material after reviewing the record. For the purpose of adjudicating the instant Motion, the facts of this case are as follows, divided into these subsections: (A) Sexual Misconduct Policy, Title IX and the GCSU Women's Center; (B) March 2018 Sexual Assault and Subsequent

Harassment; (C) Reports to the GCSU Women's Center; (D) Reports to the Police;

(E) GCSU Title IX Investigation; and (F) Title IX Hearing and Appeals.

## A.   Sexual Misconduct Policy, Title IX and the GCSU Women's Center

GCSU and the Board of Regents[1] have a Sexual Misconduct Policy that sets

forth procedures for reporting, investigating and responding to complaints of

sexual misconduct.[2]  It also defines certain categories of employees with respect to

their reporting obligations.  [Doc. 48, pp. 7–8].  Under that policy, "Confidential

Employees" are designated as such by the institution's Title IX Coordinator and

must, upon receiving a report of sexual misconduct, "only report that the incident

occurred . . . without revealing any information that would [personally identify] the

alleged victim."  [Doc. 49, p. 7].  In contrast, the category of "Responsible

Employees" includes "any administrator, supervisor, faculty member, or other

person in a position of authority who is not a Confidential Employee," and these

employees "must promptly and fully report complaints of or information regarding

sexual misconduct to the [Title IX] Coordinator."  Id.  In sum, Responsible

---

[1] GCSU is an institution of the Board of Regents.  [Doc. 48, p. 2].
[2] The parties dispute whether the Sexual Misconduct Policy or information about the Title IX process was ever distributed to the student body.  Defendants claim that the policy was disseminated to students during orientation, at which time students allegedly completed a module about Title IX.  [Doc. 48, pp. 3, 7].  Plaintiff denies ever receiving the Sexual Misconduct Policy or any information about Title IX.

Employees are required to convey all relevant information related to a report of sexual misconduct to the Title IX Coordinator, while Confidential Employees "are not bound by this requirement" and instead "may be required to report limited information about incidents without revealing the identities of the individuals involved to the Title IX Coordinator." [Doc. 38-17, pp. 7–8].

A student who wishes to file a report of sexual misconduct should inform a Responsible Employee or the Title IX Coordinator. Id. at 7. In turn, reports of sexual misconduct that could result in suspension or expulsion—such as an allegation of rape—must be reported to the USG System Director by the Title IX Coordinator. [Doc. 49, p. 14]. The USG System Director will work with the institution to determine whether any interim measures are necessary and to assign an investigator, who will work under the direction of the USG System Director. Id. at 15. The USG System Director may exercise oversight over the handling of such allegations. Id.

When a student makes a complaint of sexual misconduct against another student, the accused student (the "respondent") is given three to five days to respond, id. at 16, although a respondent may be allotted additional time based on the circumstances, [Doc. 48, p. 18]. The best practice at GCSU for completing an investigation into sexual misconduct is sixty to ninety days. [Doc. 49, p. 16].

However, the Sexual Misconduct Policy does not set forth a specific timeframe, instead providing as follows:

> Efforts will be made to complete the investigation [within] a reasonable timeframe, which will be determined based on the allegations, availability of witnesses and/or evidence, etc. in a particular case.  When the timeframe will extend past the reasonable timeframe, the parties will be informed of the delay and the reason for the delay.  The investigator shall keep the parties informed of the status of the investigation.

[Doc. 48, p. 9].

The Sexual Misconduct Policy includes terms about the provision of certain services to students involved in a complaint.  Specifically, involved parties should receive information about support services, "such as counseling, advocacy, housing assistance, academic support, disability services, health and mental services, and legal assistance, available at the student's institution." [Doc. 38-17, p. 35].  Further, an institution of the Board of Regents—such as GCSU here—may provide interim measures during the investigation of an allegation of sexual misconduct.  [Doc. 49, p. 16].  Such measures are intended to protect the victim and the community and include issuing a "no contact" order or preventing a respondent from accessing certain areas to avoid interaction with the complainant. Id. at 16–17.  GCSU typically takes the lead from the complainant when implementing interim measures.  Id. at 17.

A charge of sexual misconduct always proceeds to a hearing.  [Doc. 48, p. 20].  Board of Regents and GCSU policy outlines procedures for appealing the outcome of a hearing on a sexual misconduct charge.  Specifically, that policy provides a student receiving a sanction such as suspension with the option to appeal the underlying finding on the grounds of new information, procedural error or a discrepancy between the finding and the weight of the information.  See [Doc. 37-4, p. 7].  Appeals are directed to "the institution's Vice-President for Student Affairs"—here, GCSU's Dr. Shawn Brooks—"or his/her designee."  Id. at 8.  On appeal, the Vice President or his designee may (1) "affirm the original finding and sanction," (2) "affirm the original finding but issue a new sanction of lesser severity," (3) "remand the case back to the decision-maker to correct a procedural or factual defect" or (4) "reverse or dismiss the case if there was a procedural or factual defect that cannot be remedied by remand."  Id.  The Vice President then issues a decision in writing "within a reasonable time period."  Id.  In turn, any decision of the Vice President may be appealed in writing within five business days to the President of the institution—here, Dr. Steve Dorman, the GCSU President—with appeals limited to the same three grounds of new information, a procedural error or a discrepancy between the decision and the evidence.  Id.  On

appeal, the President has the same four options as the Vice President for Student Affairs:  affirm, affirm with a lower sanction, remand or reverse and dismiss.  Id.

Finally, the GCSU Women's Center is a resource for Title IX and provides programming on sexual assault prevention upon request.  [Doc. 48, p. 5].  At some point in 2018,[3] the GCSU Women's Center entered a "flux period" concerning its relationship to Title IX.  [Doc. 49, p. 8]; see also [Doc. 38-15, pp. 11–12]. Specifically, employees of the Women's Center transitioned from being Confidential Employees (who may be required to report incidents of sexual misconduct without identifying the alleged victim) to Responsible Employees (who are required to report complaints of sexual misconduct to the Title IX Coordinator).  [Doc. 48, p. 15].  A GCSU Women's Center employee testified that following this transition, the Women's Center was "not intended to be a part of the Title IX process" but was still "providing emotional support."  [Doc. 38-23, p. 31].

## B.    March 2018 Sexual Assault and Subsequent Harassment

Plaintiff was a student at GCSU during the academic year of 2017–2018 and the spring of 2019.  [Doc. 48, p. 2].  Between March 16, 2018, and March 22, 2018, Plaintiff and a few of her classmates visited Lake Hartwell, Georgia, for a spring break trip.  [Doc. 49, pp. 2–3].  On this trip, one of Plaintiff's classmates,

---

[3] The record does not include a precise date for this transition.

C.F., had sexual intercourse with her while she was intoxicated.[4]  Id. at 3.  Plaintiff did not remember the assault the next morning, but when she woke up, her shirt was off, and she felt very sore in her vaginal area.  Id.  Plaintiff tried to speak with C.F. about what happened, but he became angry, cursed at her and accused her of cheating on her boyfriend.  Id.

C.F. began to harass Plaintiff in the fall of 2018 and winter of 2019.  [Doc. 1, p. 7]; [Doc. 49, p. 6].  For example, C.F. joined the cheerleading team, of which Plaintiff was a member; Plaintiff subsequently left the team.  [Doc. 48, p. 29]. Plaintiff was planning to serve as a student aide in her SCUBA class; C.F. then asked to join the class.  Id.; see also [Doc. 49, p. 6].  Plaintiff told her SCUBA instructor that she was scared of C.F.  [Doc. 48, p. 29].  Plaintiff testified that C.F.'s roommate informed her and another female student, E.P., that C.F. and two friends possessed handguns and that he would shoot Plaintiff and E.P. "in the head" if they said anything about him to anyone.  Id. at 30.  C.F. also parked his

---

[4] Plaintiff characterizes this incident as a "rape."  See, e.g., [Doc. 49, p. 4].  The Court thus uses the term "rape," interchangeably with "sexual assault," and does not question, for the purpose of this Order, that C.F. raped Plaintiff.  Hill v. Cundiff, 797 F.3d 948, 955 n.2 (11th Cir. 2015) ("We refer to this incident as a rape, rather than an alleged rape, because in reviewing a motion for summary judgment 'we are required to view the facts in the light most favorable to the nonmoving party.'" (quoting Sauls v. Pierce Cnty. Sch. Dist., 399 F.3d 1279, 1281 (11th Cir. 2005))).

car in the parking lot of Plaintiff's apartment, routinely waited for her outside one of her classes and called her name repeatedly.  [Doc. 49, p. 6].

## C.    Reports to the GCSU Women's Center

As previously noted, Plaintiff did not remember the March 2018 sexual assault the following morning.  However, in November 2018, another classmate informed Plaintiff about what took place at Lake Hartwell.  [Doc. 48, p. 11].  Plaintiff then made an emergency counseling appointment through GCSU.  Id.  At the suggestion of her counselor and one of her peers, Plaintiff went to the GCSU Women's Center to report the March 2018 sexual assault and seek relief.  Id. at 11–12; [Doc. 49, p. 4].

The parties dispute when Plaintiff first reported the sexual assault to the GCSU Women's Center, and the record is similarly unclear.  In the Complaint, Plaintiff alleges that she "first attempted to report the assault and rape" to the GCSU Women's Center in either "late February or early March 2019."  [Doc. 1, p. 5].  However, Plaintiff testified in her deposition that she first reported the sexual assault in November 2018, a date she maintains in the materials opposing summary judgment.  See [Doc. 48, p. 12]; see also [Doc. 38-1, pp. 36–38].  Plaintiff also testified, though, that she did not know the exact date of her first report to the Women's Center because they lacked documentation of her visit.  [Doc. 38-1, p.

57].  Defendants dispute this timeline and argue that Plaintiff first visited the Women's Center in March 2019.  [Doc. 48, p. 12]; [Doc. 53, p. 4].  In sum, the parties agree that Plaintiff visited the GCSU Women's Center in March 2019; they merely dispute whether this was her first visit (Defendants' position) or her second (Plaintiff's).  See [Doc. 48, p. 12].

At any rate, the parties generally agree about the events that transpired once Plaintiff visited the GCSU Women's Center.  Plaintiff reported the sexual assault to an individual whom she later tentatively identified as Emily Brookshire, the Victim Services Program Coordinator.  [Doc. 49, p. 4].  Ms. Brookshire did not inform Plaintiff that she represented the Title IX office.  [Doc. 48, p. 12].  Ms. Brookshire advised Plaintiff that she could seek a no-contact policy against C.F. that would require him to stay five feet away from her.  [Doc. 49, p. 5].  Plaintiff was afraid of C.F. and fearful that he might hurt her if he were notified of a no-contact policy; she therefore decided not to pursue this option.  Id.  Moreover, because Ms. Brookshire informed her that Title IX was "not really a thing at GCSU" and that C.F. would not be found guilty in a hearing, Plaintiff did not move forward with her complaint at that time.  Id.

On March 12, 2019, Ms. Brookshire contacted GCSU's Department of Public Safety and informed Officer Adam Bishop that two female students—one of

them Plaintiff—wished to have no further contact with C.F. Id. at 8. Officer

Bishop thus issued a harassment warning on March 12, 2019, to C.F., who signed a

form saying that he would not have any "personal, telephone, email, social media,

or third party contact" with Plaintiff. Id. at 10; see also [Doc. 38-23, pp. 87–88].

## D.    Reports to the Police

On April 29, 2019, Plaintiff reported the March 2018 sexual assault to the

Baldwin County Sheriff's Office, where Detective Reid White wrote an

investigative summary. [Doc. 49, p. 10]; [Doc. 48, p. 17]. Plaintiff expressed her

belief to Detective White that GCSU was not taking her complaint seriously.

[Doc. 49, p. 11].

On May 6, 2019, Plaintiff attended a meeting of the rugby club (of which

C.F. was a member) to recount her sexual assault and subsequent harassment by

C.F., at the request of C.F.'s teammates. [Doc. 48, pp. 30–31]. After the meeting,

two students approached Plaintiff and informed her that C.F. asked them to record

her statement (which they declined to do). [Doc. 49, p. 10]. Those students

encouraged Plaintiff to report C.F.'s behavior to the police. Id. Plaintiff informed

Detective White about the incident. [Doc. 38-20, p. 30].

Detective White then spoke with Sergeant Andrew Marchetta, a member of

the GCSU Department of Public Safety, on May 6, 2019.[5]  Id.  Sergeant Marchetta

interviewed Plaintiff the same day.  Id.; see also [Doc. 49, p. 12].  During that

interview, Plaintiff reported that C.F. had a gun that he intended to use; that he

directed two individuals to record her statement to the rugby club; and that she did

not feel safe on campus.  [Doc. 49, p. 12].  Although Sergeant Marchetta was

aware of the harassment warning that was issued to C.F. on March 12, 2019, id.,

Sergeant Marchetta wrote a report concluding that C.F.'s actions in contriving to

record Plaintiff did not constitute harassment, [Doc. 48, p. 31].

## E.      GCSU Title IX Investigation

Plaintiff claims that she was not referred to the Title IX process by Ms.

Brookshire or by any other GCSU employee prior to speaking with Detective

White.  [Doc. 49, p. 12].  Defendants dispute this assertion and contend that Ms.

---

[5] The timeline of these events (and others in this case) is not clear from the parties'
respective statements of fact.  The parties assert that the rugby meeting took place in
March 2019 and that Sergeant Marchetta wrote a report on March 12, 2019, about that
incident.  [Doc. 48, pp. 30–31].  Moreover, Plaintiff alleges that she reported both the
March 2018 sexual assault *and* that C.F. "recently had attempted to have her recorded by
two other students" to the Baldwin County Sheriff's Office on April 29, 2019.  [Doc. 49,
p. 10].  However, it appears from the record that the second matter—the attempted
recording—did not occur until May 6, 2019.  See [Doc. 38-20, p. 28]; id. at 30–31.  C.F.
received a harassment warning on March 12, 2019, but Sergeant Marchetta did not write
a report about the rugby meeting until May 6, 2019.  [Doc. 38-20, p. 30].  The Court has
reconstructed the timeline as accurately as possible given the record in this case.

Brookshire referred Plaintiff to the Title IX process in March 2019.  [Doc. 53, p. 7].  The record contains a memo from Ms. Brookshire to Dr. Shawn Brooks, dated May 8, 2019, in which Ms. Brookshire explains that Plaintiff planned to contact Cynthia Johnson, GCSU Equity Compliance Investigator, about Title IX but was also "interested in other services."  [Doc. 38-23, p. 82].  Plaintiff agrees that Ms. Brookshire documented her contact with Plaintiff in this memo to Dr. Brooks.  See [Doc. 48, pp. 15–16].

In any case, the parties do not dispute that Plaintiff's reports to the police precipitated GCSU's investigation of Plaintiff's complaint.  [Doc. 49, p. 11]. Specifically, on May 7, 2019, Detective White met with Qiana Wilson, then the GCSU Title IX Coordinator and general counsel, and expressed his concerns about GCSU's response to Plaintiff's report.[6]  [Doc. 48, p. 17].  Meanwhile, Ms. Johnson met with Plaintiff, who completed a GCSU General Complaint Form.  Id.  The investigation of Plaintiff's Title IX complaint formally began on May 8, 2019, with

---

[6] During her deposition, Ms. Wilson testified that she, too, was concerned because although she was the Title IX Coordinator, her conversation with Detective White was the first time she learned of Plaintiff's complaint.  [Doc. 49, p. 11].  She stated that "[Plaintiff] had reported this incident to someone," yet "there was no information there related . . . to whom [Plaintiff] had spoken" to allow Ms. Wilson "to figure it out and follow up with individuals."  Id.

Ms. Johnson interviewing Plaintiff to confirm her complaint.[7]  Id. at 18.  Ms.

Johnson also interviewed C.F., but because he was studying abroad at the time, that

interview was delayed by approximately one month.  Id.; [Doc. 49, p. 16].

Between May 8, 2019, and September 13, 2019, Ms. Johnson interviewed about

twenty people.  [Doc. 48, p. 18].  In all, seven witnesses made statements for the

investigation.  Id.  Ms. Johnson issued an investigative report on September 13,

2019, concluding that a preponderance of the evidence supported charging C.F.

with violating the Sexual Misconduct Policy.  Id. at 19.

　　　According to Plaintiff, GCSU did not offer any interim measures or other

support services following her reports or during the investigation of her complaint.

[Doc. 49, pp. 16, 18].  During the investigation, for example, Plaintiff informed

Ms. Johnson about C.F.'s attempt to join her SCUBA class, his decision to join the

cheerleading team and his other harassing behavior, but Plaintiff was not offered

interim measures in response.  Id. at 16.  Defendants contend that Plaintiff never

requested any interim measures.  [Doc. 53, p. 10].  In any event, at some point in

---

[7] As previously noted, the Sexual Misconduct Policy requires the Title IX Coordinator to report certain allegations to the USG System Director.  [Doc. 49, p. 14].  At the time of the events at issue here, Na'Tasha Webb Prather was the USG System Director.  Id. at 15. The record contains no evidence that Ms. Prather was contacted about Plaintiff's allegation of rape or otherwise involved in the ensuing investigation.  Id.

the spring semester of 2019, Plaintiff's mental health deteriorated significantly, and she withdrew from GCSU.  [Doc. 49, p. 19].

**F.     Title IX Hearing and Appeals Process**

The hearing on Plaintiff's Title IX case was held on November 6, 2019, before a five-member panel and with Dr. Tom Miles, the Dean of Students, as the hearing officer.[8]  [Doc. 48, p. 20].  After testimony from Plaintiff, C.F. and their respective witnesses, the hearing panel found C.F. responsible for sexual misconduct and imposed sanctions, including a two-year suspension.  Id. at 21. The decision included appeal rights to Dr. Brooks.  Id.

C.F. timely appealed the November 6, 2019 hearing panel decision to Dr. Brooks.  Id. at 22.  Upon receiving the appeal, Dr. Brooks remanded the matter to the hearing panel to consider two questions:  "(1) Did the evidence from the investigation or hearing demonstrate that [Plaintiff] did not have the capacity to give consent?  (2) If [Plaintiff] did not have the capacity to give consent, did [C.F.] know or should [he] have known that [Plaintiff] did not have the capacity to give consent?"  Id. at 23.  In an email dated November 19, 2019, Dr. Brooks informed

_____

[8] Dr. Miles serves as the hearing officer for Title IX hearings at GCSU and oversees the GCSU Women's Center.  [Doc. 49, p. 19].  He acts as a "gatekeeper" for evidence during Title IX hearings.  Id.  Dr. Miles is "highly trained" in Title IX compliance and procedures through both USG and the Association for Title IX Administrators.  Id.

Plaintiff and C.F. of his remand decision and stated that each party had five days to appeal the decision.  [Doc. 49, p. 24].  Neither party appealed.  Id.

On January 7, 2020, Dr. Miles sent an email to Plaintiff and to C.F. explaining that the hearing panel considered the two questions posed by Dr. Brooks on remand and maintained their initial finding that C.F. was responsible for sexual misconduct.  [Doc. 48, p. 23].  That email advised Plaintiff and C.F. of the right to appeal the decision to Dr. Steve Dorman by January 15, 2020.  Id.; [Doc. 49, p. 26].  Again, neither party appealed.  [Doc. 49, p. 26].

On February 12, 2020, C.F. emailed Dr. Dorman, Dr. Miles, Ms. Prather (the USG System Director) and another individual and stated that "[i]f the appeal does not go in my favor, please know that it will be my life's mission to change the system and get my story out there."  Id. at 27.  When later deposed, Dr. Brooks could not recall whether he spoke to C.F. during this time period.  Id.

On February 21, 2020, Dr. Brooks sent an email to Plaintiff and C.F.  [Doc. 48, p. 26].  That email conveyed his decision that "a procedural error occurred" and that the findings from "the limited scope inquiry that [he] remanded to the original hearing panel for consideration should have been communicated to [him] for further action and decision," rather than conveyed to Plaintiff and C.F. by Dr. Miles.  Id.  Dr. Brooks then concluded the following:

> After a thorough review of the case, which includes information from the remanded limited scope inquiry, it is my decision that a "factual defect" has occurred within the case.  Specifically, I do not believe that a preponderance of the evidence has sufficiently served to find [C.F.] responsible for the charges brought against him.  Accordingly, it is my decision to dismiss the case.

Id.  This email contained appeal rights to Dr. Dorman.  Id. at 27.

Plaintiff emailed Dr. Brooks inquiring about the procedural error; he responded by explaining that "the procedural error that occurred was that the findings of the limited scope inquiry that [he] remanded to the original hearing panel for consideration should have been communicated to [him] for further action and decision."  Id.  Dr. Brooks also clarified that "the limited scope inquiry was not a second hearing."  Id.  As to the factual defect, Dr. Brooks stated that he did "not believe that a preponderance of the evidence supported a finding of 'responsible' for the charges brought against [C.F.]."  Id.

On February 24, 2020, Plaintiff emailed Dr. Dorman, copying Dr. Brooks, to appeal Dr. Brooks' February 21, 2020 decision.  Id. at 27–28; [Doc. 49, p. 28].  Dr. Dorman upheld Dr. Brooks' determination that C.F. was not responsible for the charge of sexual misconduct.  [Doc. 48, p. 28].  Plaintiff appealed that decision to the Board of Regents, which upheld Dr. Dorman's determination.  Id.  This lawsuit followed.

## PROCEDURAL HISTORY

On October 30, 2020, Plaintiff filed this action against Defendants, seeking compensatory and punitive damages and bringing claims under Title IX, 20 U.S.C. § 1681 *et seq.*; 42 U.S.C. § 1983; and Georgia law for intentional infliction of emotional distress.  [Doc. 1, pp. 14–25].  Defendants filed a Motion for Summary Judgment on November 16, 2021, [Doc. 34], and an Amended Motion for Summary Judgment the following day, [Doc. 35].[9]

On July 27, 2022, Defendants filed a Notice of Supplemental Authority Concerning their Pending Dispositive Motion.  [Doc. 56].  Defendants argue that a case decided by the United States Supreme Court on April 28, 2022—Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562 (2022)—precludes Plaintiff's Title IX claim.  Below, the Court addresses the arguments for summary judgment before considering the role of this supplemental authority in the analysis of the instant Motion.

---

[9] The amended Motion corrects a footnote in the original Motion.  See [Doc. 35, p. 1]. Therefore, the original Motion for Summary Judgment [Doc. 34] is **DENIED AS MOOT**.

## ANALYSIS

### A.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Allen, 121 F.3d at 646 (quoting Anderson, 477 U.S. at 251).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party."  Id.  After the movant satisfies this initial burden, the nonmovant bears the

burden of showing specific facts indicating that summary judgment is improper because a material issue of fact does exist.  Id.  However, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 251). If the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).

## B.    Title IX Claim

In pertinent part, Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has recognized an implied private right of action for damages under Title IX for teacher-on-student sexual harassment, see Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 284–90 (1998), and for student-on-student sexual harassment, see Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999).  The standard for a student-on-student sexual harassment claim "is far more rigorous than a claim for teacher-on-student

harassment."  Hill v. Cundiff, 797 F.3d 948, 968 (11th Cir. 2015).  In the same

vein, student-on-student sexual harassment is actionable under Title IX only if it is

"sufficiently severe."  Id. (quoting Davis, 526 U.S. at 650).

　　In its first case applying Davis, the Eleventh Circuit instructed courts faced

with a private action under Title IX to ask two questions:  "(1) was [the school]

deliberately indifferent to sexual harassment about which it had actual knowledge;

and (2) was the sexual harassment so severe, pervasive, and objectively offensive

that it can be said to have systemically deprived the victims of access to the

educational opportunities of the school?"  Hawkins v. Sarasota Cnty. Sch. Bd., 322

F.3d 1279, 1285 (11th Cir. 2003).  The Eleventh Circuit has since divided these

questions into six elements, meaning that a plaintiff bringing a student-on-student

sexual harassment claim under Title IX must prove the following:

> First, the defendant must be a Title IX funding recipient.  Second, an
> "appropriate person"—one with the authority to address the
> harassment—must have "actual knowledge of discrimination in the
> recipient's programs."  Third, the recipient must respond with
> deliberate indifference to the known acts of harassment in its
> programs.  Fourth, the recipient's deliberate indifference must
> "subject[] the plaintiff to further discrimination."  Fifth, the
> harassment must be "severe, pervasive, and objectively offensive."
> Sixth, the harassment must "effectively bar[] the victim's access to an
> educational opportunity or benefit."

Garrett v. Univ. of S. Fla. Bd. of Trs., 824 F. App'x 959, 964 (11th Cir. 2020)

(alterations in original) (citations omitted).  In this case, the first factor is not in

dispute.[10]

The Complaint does not specify the precise actions on which Plaintiff's Title

IX claim is premised, other than a generalized allegation that GCSU failed to

follow certain policies and procedures in the resolution of Plaintiff's report of

sexual misconduct.  As best the Court can discern, the claim has three general

components:  (1) the response to and investigation of Plaintiff's reports of the rape

and of the harassment she experienced from C.F.; (2) the provision, or absence

thereof, of interim measures; and (3) the appeals process.  Defendants argue that

---

[10] The Court will briefly clarify which Defendants face liability under Title IX.  Although Plaintiff named Dr. Dorman and Dr. Brooks as defendants for the Title IX claim, those individuals cannot be sued in either their individual or official capacities under this statute.  See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009) ("Title IX reaches institutions and programs that receive federal funds, which may include nonpublic institutions, but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." (citations omitted)).  The remaining defendants are GCSU and the Board of Regents.  However, GCSU cannot be sued as a legal entity, leaving the Board of Regents as the only defendant facing liability on the Title IX claim.  See, e.g., Sasser v. Bd. of Regents of Univ. Sys. of Ga., No. 1:20-CV-4022, 2021 WL 4478743, at *3 (N.D. Ga. Sept. 30, 2021) ("It is well established that member institutions of the Board are not 'separate or distinct' legal entities, and, therefore, 'cannot sue or be sued.'" (quoting Bd. of Regents of the Univ. Sys. of Ga. v. Doe, 278 Ga. App. 878, 878 (2006))), appeal dismissed, No. 21-14433-AA, 2022 WL 854322 (11th Cir. Feb. 15, 2022).  For these reasons, summary judgment is **GRANTED** to Dr. Dorman, Dr. Brooks and GCSU on the Title IX claim.  The Court nonetheless refers to "Defendants" in this section of the Order.

they are entitled to summary judgment on components (1) and (2) because they

lacked actual knowledge of the sexual assault and harassment during the relevant

time period.  As to component (3), Defendants seek summary judgment because

they contend that they were not deliberately indifferent in the appeals process.  The

Court evaluates these arguments below before considering the impact of

Cummings, the supplemental authority filed by Defendants, on Plaintiff's Title IX

claim.

      1.    *Components (1) and (2):  Response and Interim Measures*

     A Title IX plaintiff must show that an "appropriate person"[11] who was

"capable of putting the [funding recipient] on notice had 'actual knowledge' of

[the] sexual harassment and discrimination."  Hill, 797 F.3d at 970 (quoting

Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1293 (11th Cir.

2007)).  An "'appropriate person' is an official of the recipient entity who 'at a

minimum has authority to address the alleged discrimination and to institute

---

[11] Defendants did not fully address whether Ms. Brookshire was an "appropriate person"
within the meaning of Title IX.  See Hill, 797 F.3d at 971.  Although Defendants refer to
the "transition" in the GCSU Women's Center, see [Doc. 34-2, pp. 8–9], they do not
explain the impact of this supposed transition on whether Ms. Brookshire was an
"appropriate person."  For the purposes of deciding the instant Motion, then, the Court
assumes that Ms. Brookshire was an "appropriate person" for this element of the claim.
See Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1319 (11th Cir. 2012)
(stating that "the failure to make arguments and cite authorities in support of an issue
waives it").

corrective measures on the recipient's behalf.'" Id. at 971 (quoting Gebser, 524

U.S. at 290).  A plaintiff must also establish the *nature* of an appropriate person's

knowledge by proving that "the funding recipient had actual knowledge that the

student-on-student sexual harassment was severe, pervasive, and objectively

offensive." Id. at 969.

　　As a threshold matter, the parties dispute when Plaintiff first reported her

sexual assault and C.F.'s harassment to GCSU.  Plaintiff contends that her first

report occurred in November 2018; Defendants counter that she made no such

report until March 2019.  The Court finds that this discrepancy is a genuine dispute

of material fact.  The date of Plaintiff's first report is material because it affects

two factors of the Title IX analysis:  if and when Defendants had actual knowledge

of the harassment (factor two) and whether their response to that knowledge was

deliberately indifferent (factor three).  Moreover, the Court finds this dispute to be

genuine; a reasonable jury could credit Plaintiff's testimony that her first report

was in November 2018.  In turn, a jury could find Defendants' failure to

investigate Plaintiff's claim until May 2019, six months later, to constitute

deliberate indifference.  Because the deliberate indifference standard measures the

reasonableness of a response against the "'known circumstances,'" Garrett, 824 F.

App'x at 964 (quoting Doe v. Sch. Bd. of Broward Cnty., 604 F.3d 1248, 1263

(11th Cir. 2010)), if and when Defendants had actual knowledge of the sexual assault and harassment impacts whether they were deliberately indifferent in their ensuing response.  As a result of this factual dispute, the Court declines to grant summary judgment on the first component of Plaintiff's Title IX claim.[12]

The parties also dispute whether Plaintiff was informed of or provided interim measures or support services.  The timing and nature of Defendants' knowledge informs whether the alleged failure to provide Plaintiff with interim measures evinced deliberate indifference by exposing Plaintiff to further harassment.  See Hill, 797 F.3d at 973.  Consequently, summary judgment is not warranted as to the second component of Plaintiff's Title IX claim.

The above analysis does not apply to the third component of Plaintiff's Title IX claim:  the appeals process.  The parties agree that Defendants had actual knowledge of the events at issue by May 2019, and certainly by the time of the hearing and appeals later that year and in early 2020.  The second factor, actual knowledge, is therefore established for the third component of Plaintiff's Title IX

---

[12] The Court considers the date of Plaintiff's first report to be the primary dispute of fact that precludes entry of summary judgment.  However, other disputes of fact exist: whether Ms. Brookshire was a Confidential or Responsible Employee when Plaintiff reported the sexual assault and harassment, if and when Ms. Brookshire complied with any associated reporting obligations and when Plaintiff was referred to the Title IX process.

claim.  The next question for the Court is whether Defendants acted with deliberate indifference in the appeal and resolution of Plaintiff's Title IX case.

2.      *Component (3):  Appeals Process*

In a student-on-student harassment claim under Title IX, deliberately indifferent conduct occurs "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648.  Despite this description, the deliberate indifference standard is not one of "mere 'reasonableness'"; as such, courts can identify a clearly unreasonable response as a matter of law on a motion for summary judgment.  Id. at 649; see also Doe v. Bibb Cnty. Sch. Dist., 688 F. App'x 791, 797 (11th Cir. 2017) (affirming summary judgment on the issue of deliberate indifference).  "A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it."  Hill, 797 F.3d at 973.

Plaintiff claims that Dr. Brooks' reversal of the remand decision and Dr. Dorman's subsequent approval of that decision violated Title IX.  Defendants argue that Dr. Brooks and Dr. Dorman complied with GCSU and Board of Regents policy and that their conduct was nonetheless not clearly unreasonable.  Plaintiff disagrees for two reasons.

First, Plaintiff claims that "there is a question of material fact as to whether [Dr. Brooks] violated [Plaintiff's] right to due process under Title IX when he *sua sponte* overturned the hearing panel's decision on the limited scope review."  [Doc. 47, p. 9].  Plaintiff does not point this Court to any precedent recognizing a private right of action under Title IX for a due process violation.  To reiterate the law applicable to Plaintiff's claim, Title IX protects individuals from sex-based discrimination in federally-funded educational institutions.  See 20 U.S.C. § 1681(a).  An individual can thus bring a private right of action under Title IX for discrimination based on sex.  See Cannon v. Univ. of Chi., 441 U.S. 677, 709 (1979) ("Not only the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of action in favor of private victims of discrimination.").  In the absence of authority to support Plaintiff's ostensible position that a due process violation is actionable under Title IX, the Court declines to address this argument further.

Second, Plaintiff contends that Dr. Brooks and Dr. Dorman displayed such incompetence with respect to the appeals process that their actions amount to deliberate indifference.  In particular, she claims that "a jury could determine that [Dr. Brooks' and Dr. Dorman's] failure to understand and be knowledgeable of the policy and process for which they are the decision-makers amounts to deliberate

indifference" and was "clearly unreasonable under the circumstances."  [Doc. 47, p. 10].  The Court is not persuaded by this argument.  A "clearly unreasonable" response is one that subjects a victim to harassment or renders her more vulnerable to it.  Hill, 797 F.3d at 973.  Plaintiff has not explained how Dr. Brooks' or Dr. Dorman's actions on appeal—even if frustrating or unfavorable—caused her to suffer further harassment.

To the extent that Plaintiff argues that the resolution of the appeal violated GCSU and Board of Regents policy, Plaintiff has not identified any precedent holding that a violation of school policy necessarily equates to a violation of Title IX.  In fact, recent case law from the Eleventh Circuit suggests just the opposite: "A deviation from a Title IX policy is not, in and of itself, a violation of Title IX." Doe v. Samford Univ., 29 F.4th 675, 688 (11th Cir. 2022).

At bottom, deliberate indifference is a rigorous standard.  See Bibb Cnty. Sch. Dist., 688 F. App'x at 798 (Martin, J., concurring) (observing "how hard it is to meet the standard for relief under Title IX in cases of student-on-student sexual assault").  It requires "an official decision by the [funding] recipient not to remedy the violation."  Hill, 797 F.3d at 968 (alteration in original) (quoting Gebser, 524 U.S. at 290).  In particular, the Eleventh Circuit has found "potential Title IX liability for student-on-student harassment" where "the school responded to a

report of sexual harassment by effectively doing nothing."  Garrett, 824 F. App'x

at 965.  The Court cannot conclude that the reversal of a hearing determination,

following a full hearing, amounts to "effectively doing nothing."  Moreover, as a

general principle, "courts should refrain from second-guessing the disciplinary

decisions made by school administrators."  Davis, 526 U.S. at 648.  Summary

judgment is therefore **GRANTED** to Defendants to the extent that Plaintiff's Title

IX claim pertains to the appeals process.

  3. *Role of Cummings*

  In Cummings, the Supreme Court held that emotional distress damages were

not available under the Spending Clause statutes, which include Title IX.  142 S.

Ct. at 1576.  In the Notice of Supplemental Authority, Defendants contend that

Plaintiff seeks only emotional distress damages and that Cummings mandates

summary judgment in their favor on Plaintiff's Title IX claim.  See [Doc. 56, p. 3].

Plaintiff counters that Defendants' position improperly expands the Supreme

Court's holding in Cummings.  See [Doc. 57, p. 3].

  Defendants did not seek summary judgment on the grounds that Plaintiff

failed to establish damages.  Of course, Cummings was decided on April 28, 2022,

well after Defendants moved for summary judgment on November 16, 2021.

Because the issue of Plaintiff's damages was not raised on summary judgment,

though, Plaintiff did not have reason to set forth those damages in any detail in the materials opposing summary judgment or otherwise.  The issue was not addressed in the record, and as such, it is not properly before the Court now.  Although the parties provided cursory briefing on Cummings, the Court lacks the developed arguments and evidentiary support that it needs to properly rule on this issue as a matter of summary judgment.  The only information pertaining to the damages sought by Plaintiff is contained in the Complaint, which is not evidence.  See Wright v. Farouk Systems, Inc., 701 F.3d 907, 911 n.8 (11th Cir. 2012) ("[P]leadings are only allegations, and allegations are not evidence of the truth of what is alleged.").  Consequently, the Court declines to grant summary judgment on the basis of Cummings at this time.

**C.   § 1983 Claim**

In the Complaint, Plaintiff alleges that Dr. Brooks and Dr. Dorman are individually liable under § 1983 "for their failure to implement policies and procedures to ensure compliance with Title IX."  [Doc. 1, p. 22].  Defendants moved for summary judgment on the grounds that Title IX cannot be the basis of a

§ 1983 claim and that, even if it could be, Dr. Brooks and Dr. Dorman are entitled

to qualified immunity.[13]

In Plaintiff's response opposing summary judgment, she claims that Dr.

Brooks and Dr. Dorman violated her right to due process under the Fourteenth

Amendment to the United States Constitution by failing to follow the policy for

student appeals and are thus liable under § 1983.  [Doc. 47, p. 18].  Yet the

Complaint purported to bring a § 1983 claim for a Title IX violation, not for a

procedural due process claim under the Fourteenth Amendment.  It is well settled

that "[a] plaintiff may not amend her complaint through argument in a brief

opposing summary judgment."  Gilmour v. Gates, McDonald & Co., 382 F.3d

1312, 1315 (11th Cir. 2004).  Further, Plaintiff did not respond to the substance of

Defendants' arguments regarding the viability of bringing a § 1983 claim for a

Title IX violation, and her arguments that address the assertion of qualified

immunity only do so in the context of a procedural due process claim.  "Failure to

respond to the opposing party's summary judgment arguments regarding a claim

constitutes an abandonment of that claim and warrants the entry of summary

---

[13] Defendants also argued that in their official capacities, Dr. Brooks and Dr. Dorman are
entitled to immunity under the Eleventh Amendment to the United States Constitution.  It
appears that Plaintiff brought the § 1983 claim against Dr. Brooks and Dr. Dorman in
their individual capacities only.  The Court therefore declines to address the application
of Eleventh Amendment immunity to the § 1983 claim.

judgment for the opposing party."  <u>Burnette v. Northside Hosp.</u>, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004).  Because Plaintiff failed to respond to Defendants' arguments regarding her § 1983 claim as originally pled, the Court deems it abandoned.  Further, Plaintiff may not amend her Complaint to add a § 1983 procedural due process claim by raising the argument for the first time in her response to the instant Motion.  Summary judgment is thus **GRANTED** on the § 1983 claim.

**D.     Claim for Intentional Infliction of Emotional Distress**

Plaintiff's final claim is for intentional infliction of emotional distress under Georgia law against Dr. Brooks and Dr. Dorman in their official capacities.[14] Defendants contend that sovereign immunity under the Eleventh Amendment and under Georgia state law precludes Plaintiff's tort claim.

"The Eleventh Amendment to the Constitution bars federal courts from entertaining suits against states."  <u>Abusaid v. Hillsborough Cnty. Bd. of Cnty.</u>

---

[14] The Complaint does not specify if this tort claim is against Dr. Brooks and Dr. Dorman in their official capacities only or in their individual capacities as well.  However, in the response opposing summary judgment, Plaintiff addressed the claim only as to these two defendants in their official capacities.  The Court's analysis is similarly limited, and to the extent that Plaintiff purported to bring the tort claim against any other party, the Court considers that claim abandoned.  <u>See</u> <u>Resol. Tr. Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

Comm'rs, 405 F.3d 1298, 1302 (11th Cir. 2005).  Suits against state employees in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690, n.55 (1978)).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  Id. at 166.  Plaintiff's claim against Dr. Brooks and Dr. Dorman in their official capacities thus amounts to a suit against the State of Georgia.

The Georgia Constitution preserves the State's sovereign immunity unless expressly waived by an act of the General Assembly.  Ga. Const. art. 1, § 2, ¶ IX. In turn, the Georgia Tort Claims Act ("GTCA") provides a limited waiver of the State's sovereign immunity.  Id.  The question for the Court is whether the GTCA's waiver of sovereign immunity applies to Plaintiff's tort claim or whether the State of Georgia retained its sovereign immunity under the Eleventh Amendment for claims of this nature.

The GTCA protects state officers from suit for torts that occur within the scope of their official duties or employment.  See O.C.G.A. § 50-21-25(a). Importantly, the GTCA does not waive sovereign immunity for actions brought in

federal court.  O.C.G.A. § 50-21-23(b); see also Alyshah v. Georgia, 239 F. App'x

473, 474 (11th Cir. 2007) ("[The GTCA] specifically *preserves* the State of

Georgia's sovereign immunity from suits in federal courts.").  All tort actions

involving state officers must be brought in the state or superior court where the tort

occurred, not in federal court.  O.C.G.A. § 50-21-28.  Therefore, because the

GTCA's waiver applies only in state or superior court, Georgia has not waived its

sovereign immunity for tort claims in a federal forum.  Plaintiff's claim for

intentional infliction of emotional distress is consequently barred by the Eleventh

Amendment.[15]  Summary judgment is **GRANTED** on the claim for intentional

infliction of emotional distress.

## CONCLUSION

The Motion for Summary Judgment [Doc. 34] is **DENIED AS MOOT**.  The

Amended Motion for Summary Judgment [Doc. 35] is **GRANTED IN PART** and

**DENIED IN PART**.  Summary judgment is **GRANTED** to Dr. Brooks, Dr.

Dorman and GCSU on Plaintiff's Title IX claim in its entirety.  Summary

judgment is further **GRANTED** to the Board of Regents as to Plaintiff's claim that

---

[15] Plaintiff does not address the foregoing law in her response.  Instead, she argues that
the GTCA does not provide Dr. Brooks and Dr. Dorman with immunity because they
acted *outside* the scope of their employment by failing to follow the policy for appeals.
Even if Dr. Brooks and Dr. Dorman acted outside the scope of their employment—which
the Court declines to decide—Plaintiff has brought her claim in the wrong forum.

Defendants violated Title IX in the appeals process and **GRANTED** to Defendants as to the § 1983 claim and the claim for intentional infliction of emotional distress. Summary judgment is **DENIED** with respect to Plaintiff's claim against the Board of Regents that Defendants violated Title IX (1) in the initial response to and investigation of her report and (2) in the failure to provide interim measures.

To the extent that Defendants' Notice of Supplemental Authority purported to move for summary judgment on the basis of <u>Cummings</u>, summary judgment on that ground is **DENIED WITHOUT PREJUDICE**. Defendants may file a dispositive motion within twenty-one days of this order. Such motion may not revisit arguments previously addressed by the Court and shall be limited to the issue of recoverable damages. A response to any dispositive motion shall be due fourteen days after the motion is filed. Any reply shall be filed seven days after the filing of a response. The parties must provide evidence on the issue of damages rather than relying on legal arguments alone.

In the event that no dispositive motion is filed, the parties are **HEREBY ORDERED** to file the consolidated pretrial order required by Local Rule 16.4 no later than thirty days from the entry of this Order. The parties are notified that a failure to comply with this Order may result in sanctions, including dismissal of the case or entry of default judgment. In the event a consolidated pretrial order is

not filed, the Clerk is **DIRECTED** to submit the case at the expiration of the

applicable time period.

       **SO ORDERED** this 19th day of September, 2022.

                                         J. P. BOULEE
                                         United States District Judge